IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROBNEEKA ROBINSON, | ) | Case No. 1:22-CV-0968 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |
| | ) | |

Plaintiff, Robneeka Robinson, seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. Robinson challenges the Administrative Law Judge's ("ALJ") negative findings, contending that the ALJ erred in (i) evaluating her subjective symptoms complaints with regard to her pseudotumor cerebri, and (ii) finding that she could perform frequent bilateral fingering and handling as part of her residual functional capacity ("RFC"). Although the ALJ properly evaluated Robinson's manipulative limitations, the ALJ failed to apply proper legal standards in articulating his reasoning for rejecting Robinson's subjective complaints; the Commissioner's final decision denying Robinson's applications for DIB and SSI is vacated and that Robinson's case is remanded for further consideration.

I.      **Procedural History**

On August 10, 2017, Robinson applied for DIB, and on July 26, 2017, she also applied for SSI. (Tr. 212, 241).[1] Robinson alleged that she became disabled on December 1, 2018[2] due to (i) carp[a]l tunnel syndrome in her left wrist, (ii) intercranial hypertension, (iii) thyroid disease, and (iv) fibromyalgia. (Tr. 245, 247). The Social Security Administration denied Robinson's applications initially and upon reconsideration. (Tr. 111-127, 129-146). Robinson requested an administrative hearing. (Tr. 210-211).

ALJ Reuben Sheperd heard Robinson's case on June 4, 2019 and denied her applications in a June 26, 2019 decision. (Tr. 15-26, 32-80). In doing so, the ALJ determined that Robinson had the RFC to perform work at the sedentary exertion level, with the following limitations:

> [F]requent climbing of ramps and stairs; never climbing ladders, ropes, or scaffolds; frequent balancing, stooping, kneeling, crouching, and crawling; frequent handling and fingering bilaterally; limited to simple, routine tasks, without a production-rate pace; limited to infrequent and superficial contacts (short duration and for a specific purpose) with others; can adapt to settings with infrequent changes; and can perform low stress work, meaning no arbitration, negotiation, responsibility for the safety of others, or supervisory responsibility.

(Tr. 20). On April 20, 2022, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3). On June 7, 2022, Robinson filed a complaint to obtain judicial review. ECF Doc. 1.

II.     **Evidence**

   A.   **Personal, Educational, and Vocational Evidence**

Robinson was born on August 13, 1978, and was 40 years old on the amended alleged onset date. (Tr. 254). She completed eleventh grade in 1995 and health aid training in 1998.

---

[1] The administrative transcript appears in ECF Doc. 9.
[2] Robinson initially alleged that she became disabled in 2006, but later amended that date to December 1, 2018. (Tr. 245). For ease of reference, the amended alleged onset date will be simply referred to as the onset date in the remainder of this opinion.

(Tr. 248). She had prior work experience as a caterer and retail store manager, but the ALJ determined that Robinson had no past relevant work. (Tr. 24, 248).

**B.**     **Relevant Medical Evidence**

Because the focus of Robinson's arguments is the ALJ's consideration of her physical impairments, particularly her pseudotumor cerebri and manipulation abilities, it is only necessary to summarize the medical evidence relevant to those conditions. Some records predating Robinson's onset date, however, have been included for context.

From 2015 to 2016, Robinson sought treatment for carpal tunnel syndrome in both her hands. In her left hand, she'd had both a corticosteroid injection and, in October 2015, a carpal tunnel release procedure; but she experienced no relief. (Tr. 358, 363, 515, 559, 561-562). In May 2016, Robinson underwent an electromyography (EMG) test on her hands, which showed a right median neuropathy consistent with carpal tunnel syndrome, "which is mild in degree electrically." (Tr. 356). In July 2016, she had an ultrasound of her hands, which indicated she had carpal tunnel syndrome in both. (Tr. 337). Robinson continued to receive treatment and, also in May 2016, started therapy in both hands, but stopped by October 2016. (Tr. 357-364). Her last therapy note indicated that she "was progressing as expected toward functional goals based on pain levels" but the therapist was unable to formally assess her progress "due to non-compliance with therapy plan of care." (Tr. 357). Robinson was ultimately discharged from therapy because she did not return or schedule any further appointments. *Id.*

On August 2, 2017, Robinson saw Keith Torrey, M.D., complaining of pain. (Tr. 456). It was noted that for about six months, she had been having issues with her balance and vision, indicating that when she turned her head, she felt a posterior headache radiating upward and that "someone is closing my eyes, it's like I'm blacking out." *Id.* She also noted dizziness. *Id.*

3

Dr. Torrey's impression was that her balance and vision issues "[c]ould certainly be associated with pseudotumor cerebri, though [Robinson] has been reportedly adherent to Diamox on most days." (Tr. 460-461). On physical examination, Dr. Torrey also noted that she had restricted range of motion bilaterally in her wrists, particularly in her left. (Tr. 460).

On August 3, 2017, Robinson underwent an ophthalmology exam. (Tr. 452). She reported having episodes of her vision "blacking out" when turning her head left or right. *Id.* She also noted her history of idiopathic intracranial hypertension, having been diagnosed with it at 15, and reported that she awoke with blurred vision, had daily headaches, and experienced occasional visual obscurations. *Id.* There was no evidence of optic disc edema or vision loss, and she was instructed to continue her current treatment. (Tr. 454-455).

On August 27, 2017, Robinson was seen at the emergency room for a headache after being involved in a motor vehicle accident the day prior. (Tr. 493).

On August 31, 2017, Robinson was seen at the emergency room for a headache, which she'd had for several days, on the left side of her head, behind her left eye, and on the back of her head. (Tr. 487). Tylenol and Motrin provided no relief. *Id.* She described the pain as 12/10, throbbing, pounding in her left occipital and parietal areas, and causing photosensitivity. *Id.* On physical examination, it was noted that she was obese, had signs of hypertension, and mild photosensitivity, but was otherwise normal. (Tr. 488-489). Intravenous medications greatly improved her symptoms. (Tr. 490).

From September 5 to 8, 2017, Robinson was admitted to and treated at University Hospitals for headaches. (Tr. 482, 500). She was diagnosed with pseudotumor cerebri. (Tr. 500). Because she had uncontrollable pain, her neurologist instructed her to go to the hospital. *Id.* While admitted, Robinson underwent a lumbar puncture, which showed a 20 cm

reduction in pressure. (Tr. 496). Robinson indicated that her headache improved with medication. (Tr. 503). A neurologist also saw Robinson and noted that she did not have any focal weakness or numbness on examination. *Id.* The neurologist also increased her acetazolamide and recommended an ophthalmology consultation. (Tr. 506-507, 524-528). The ophthalmologist assessed Robinson with pseudotumor cerebri, noting that she had no acute eye changes or findings. (Tr. 509, 529-531). Once stabilized, she was discharged. (Tr. 501).

On October 31, 2017, Robinson saw Dr. Torrey. (Tr. 614). Robinson reported "[n]o more headaches" and that the pain in her body seemed "somewhat stable/maybe slightly better." *Id.* On physical examination, she was, generally, normal. (Tr. 619). Dr. Torrey did not make any diagnoses related to her headaches or vision. *Id.*

On April 10, 2018, Robinson saw Dr. Torrey. (Tr. 605). She reported tension-like headaches that worsened with noise, and "w/ lack of PO intake," but were better when she laid down. *Id.* A review of her systems was, generally, normal. (Tr. 606). On physical evaluation, Dr. Torrey noted that Robinson was awake, alert, responsive, and calmly conversed; he noted that her "nares" were close and had significant inflammation, but she was otherwise normal. (Tr. 610). His impression was that her headaches were consistent with tension headaches, rather than pseudotumor cerebri. (Tr. 611).

On March 22, 2019, Robinson was seen at the emergency room for a headaches, which she reported had been coming and going for the past two weeks. (Tr. 705). She denied any blurry vision, double vision, or pain behind her eyes, but noted her headache worsened with light and she had some nausea. *Id.* A review of her systems and her physical examination results were, generally, normal, but it was noted that she was slightly hypertensive and tachycardic. (Tr. 705-706). She was given medication and discharged. (Tr. 706).

5

On March 27, 2019, Robinson went to the emergency room for a worsening headache and nausea. (Tr. 711). She reported that her neurologist recommended she undergo a lumbar puncture and an evaluation by neurosurgery for a potential shunt. *Id.* She reported a constant, occipital headache with nausea and blurry vision. *Id.* A review of her systems and her physical examination results were, generally, normal. (Tr. 714). After a neurology consultation, Robinson was to undergo a lumbar puncture[3] and a consultation with ophthalmology. (Tr. 714, 716-718, 721-722). Ophthalmology's examination was inconclusive. (Tr. 719-720). Robinson was admitted, and the following day, reported that her headache was an 8/10, was occipital and radiating to the frontal region, and caused nausea and vision changes. (Tr. 723).

On April 10, 2019, Robinson saw neurologist Alan Hoffer, M.D., for consideration of a ventriculoperitoneal shunt. (Tr. 697). She reported her history of pseudotumor cerebri and having waxing and waning headaches; she was not having headaches, neck or back pain, or stiffness in her neck; and she did not think the lumbar puncture improved her headaches. *Id.* Robinson also noted a history of migraines, for which she tried medication without any relief. *Id.* Dr. Hoffer noted that Robinson's recent lumbar puncture showed an opening pressure of 28 mm H20, and that a CT scan of her head was within normal limits. *Id.* A review of her systems indicated that Robinson felt poorly and tired, was wheezing, and had constipation, incontinence, muscle weakness, muscle cramps, joint swelling/stiffness, limb pain/swelling, edema of the lower extremities, back and neck pain, headaches, confusion, dizziness, tingling, limb weakness, difficulty walking, memory lapses or losses, sleep disturbances, anxiety, depression, and a tendency for easy bruising. (Tr. 697-698). She was, however, independent in her daily living activities. (Tr. 698). Her physical examination results were normal. (Tr. 702). Dr. Hoffer

---

[3] The records indicate that Robinson was to undergo a lumbar puncture the following day; however, that note was not included in the administrative transcript. (Tr. 725).

6

assessed Robinson with idiopathic intercranial hypertension, but noted that the cause was unclear and opined that she should consider an intercranial pressure monitoring trial. *Id.* On May 2, 2019, Robinson had the monitor placed. (Tr. 81, 703).

      **C.**      **Relevant Opinion Evidence**

            **1.**      **Medical Source Statement: Keith W. Torrey, M.D.**

On October 31, 2017, Dr. Torrey completed a medical source statement regarding Robinson's physical functionality. (Tr. 597-598). He concluded that Robinson's lifting, carrying, and sitting capabilities were not impaired. (Tr. 597). But her standing and walking abilities could be affected by her impairment when she was ill, noting that her pseudotumor cerebri could cause unpredictable balance issues and her fibromyalgia and chronic pain could also impact her abilities. *Id.* He concluded Robinson could frequently complete nearly all postural activities, except for balancing, which could be impacted by her pseudotumor cerebri. *Id.* He also found that she could frequently reach, push/pull, and finely and grossly manipulate, and had no environmental limitations. (Tr. 598). He noted that, when her pseudotumor cerebri was active, Robinson would need the ability to alternate position and her severe pain interfered with her concentration, took her off task, and caused absenteeism. *Id.* He could not opine, however, on whether she would need additional unscheduled rest periods during an 8-hour workday outside of the normal periods provided. *Id.*

            **2.**      **State Agency Consultants**

On October 16, 2017, Venkatachala Sreenivas, M.D., reviewed the medical evidence to evaluate Robinson's physical limitations. (Tr. 122-123). Dr. Sreenivas found that Robinson was exertionally limited to (i) occasionally lifting/carrying 20 pounds, (ii) frequently lifting/carrying 10 pounds, (iii) standing or walking for about 6 hours in an 8-hour workday, (iv) sitting for about

7

6 hours in an 8-hour workday, and (v) was unlimited in her pushing or pulling, except as indicated for lifting and carrying. (Tr. 122). He specifically noted that her limitations were secondary to headaches from her pseudotumor cerebri and degenerative disc disease. *Id.* Dr. Sreenivas also found the following postural limitations to (i) frequent climbing of ramps/stairs; (ii) never climbing ladders, ropes, and scaffolds; and (iii) frequent balancing, stooping, kneeling, crouching, and crawling. (Tr. 122-123). He noted that the limitations were due to her headaches from her pseudotumor cerebri, degenerative disc disease, and obesity. (Tr. 123). He did not find any other limitations. *Id.*

On February 5, 2018, Mehr Siddiqui, M.D., reconsidered Robinson's limitations based on the medical record and affirmed Dr. Sreenivas's findings. (Tr. 140-141).

    D.    **Relevant Testimonial Evidence**

        1.    **Robneeka Robinson**

Robinson testified at the hearing. (Tr. 45-70). She testified that she had a valid home health aide certificate, with which she did home health aide work on her own, and had previously worked for a temp service that placed her in various office or factory positions. (Tr. 47-49). She believed the biggest reason she could not work was her pseudotumor that caused balance issues and vision changes. (Tr. 50-51). Her vision would change "hour by hour and day to day," and the changes would last a couple of days. (Tr. 51-52). She noticed that, if she missed her medication, she would have more fluid build-up in her head, which would impact her vision. *Id.* She also had daily headaches, lasting throughout the day, that would worsen throughout the day and with aggravating factors, such as light or sound. (Tr. 52-53). Several times a day, her pain would get so intense she needed to lay down. (Tr. 71). Her balance issues were also, generally, continuous and would occasionally cause her to fall; to help her remain steady, every couple of

weeks she would use a cane. (Tr. 53-54). Her medications were, generally, effective, and her conditions worsened if she missed a dose. (Tr. 55).

Robinson also indicated she had carpal tunnel syndrome in both hands, noting that she, at one point, lost the touch sensation in her left hand. (Tr. 57). She had a release procedure on her left hand, but it was ineffective. *Id.* Her right hand now had the same symptoms, and, as a result, she had trouble gripping things; would drop things; could not open jars, bottles, or hold bags; and could no longer do fine manipulation. (Tr. 58-59).

### 2. Vocational Expert

Daniel Simone, a vocational expert, testified at the hearing. (Tr. 74-80). The VE testified that a hypothetical individual of Robinson's age, experience, and with the ALJ's proposed limitations, including to light work and only frequent handling or fingering bilaterally, could perform work in the national economy. (Tr. 75-76). If the limitations were altered to only occasional handling and fingering bilaterally at the sedentary level, the VE testified that the combination of limitations would be work preclusive. (Tr. 77).

### III. Law & Analysis

#### A. Standard of Review

The court's review of the Commissioner's final decision denying disability benefits is limited to "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009). Substantial evidence exists "if a reasonable mind might accept the relevant evidence as adequate to support a conclusion," *id.* at 406 (internal quotation marks omitted), even if a preponderance of the evidence might support the opposite conclusion. *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020). However, the ALJ's decision will

not be upheld when the ALJ failed to apply proper legal standards and the legal error prejudiced the claimant. *Rabbers v. Comm'r SSA*, 582 F.3d 647, 654 (6th Cir. 2009). Nor will the court uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotation marks omitted).

      **B.     Step Four: Residual Functional Capacity**

Robinson contends that the ALJ erred in the evaluation of her RFC with regard to her pseudotumor cerebri and the limitations from her carpal tunnel syndrome. *See* ECF Doc. 11. As to her pseudotumor, she argues that the ALJ's reasons for discounting her subjective symptoms complaints did not address the intensity, persistence, and limiting effects of her symptoms and the ALJ ignored medical evidence supporting her testimony, ultimately, causing the decision to lack an adequate explanation of the ALJ's reasoning. ECF Doc. 11 at 16-19. As to her carpal tunnel syndrome, Robinson asserts that the ALJ failed to adequately discuss the evidence of her limitations, cherry-picking the record to support the limitation. ECF Doc. 11 at 19-22.

The Commissioner disagrees; arguing that the ALJ reasonably evaluated Robinson's impairments, particularly her manipulative limitations, because Robinson failed to provide medical evidence from the relevant period of her carpal tunnel syndrome. ECF Doc. 12 at 5-8.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an assessment of a claimant's ability to do work despite her impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments,

10

even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5. Relevant evidence includes a claimant's medical history, medical signs, and laboratory findings. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

The ALJ must also consider a claimant's subjective symptom complaints in assessing a claimant's RFC. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e); *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) ("Subjective complaints of pain or other symptoms may support a claim of disability."). Generally, an ALJ must explain whether he finds the claimant's subjective complaints consistent with objective medical evidence and other evidence in the record. SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017); *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) (The ALJ must clearly explain his reasons for discounting subjective complaints). In conducting this analysis, the ALJ may consider several factors, including claimant's efforts to alleviate her symptoms, whether any treatment was effective, and any other factors concerning the claimant's functional limitations and restrictions. SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible). The regulations don't require the ALJ to discuss each factor or each piece of evidence, but only to acknowledge the factors and discuss the evidence that supports his decision. *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'" (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).

11

Although the ALJ, in determining Robinson's RFC, correctly applied the proper legal standards in his evaluation of her manipulative limitations, the explanation for why he discounted Robinson's subjective symptoms complaints as to her pseudotumor was insufficient to permit meaningful review. Remand is required. *See Rabbers*, 582 F.3d at 654; *Fleischer*, 774 F. Supp.2d at 877.

Turning first to Robinson's manipulative limitations, the ALJ's conclusion that Robinson could frequently finger and handle things with both hands was not erroneous. Despite its brevity, Robinson cannot show that the ALJ's conclusion regarding her carpal tunnel syndrome – which he based on pre-onset date medical evidence – was erroneous, because there was no medical evidence from within the relevant time period. Robinson contends that the ALJ cherry-picked the record on this issue, citing only EMG results from 2016. (*See* Tr. 17-24). But, in support of her cherry-picking contention, Robinson herself has only cited – and the record evidence only contains – medical records that predated Robinson's onset date. ECF Doc. 11 at 19-22. "Generally, when a . . . claimant simply fails to present any contemporaneous medical evidence of disability from the relevant time period, the claimant cannot carry their burden of proving their disability for the relevant period." *See Grisier v. Comm'r of Soc. Sec.*, 721 F. App'x 473, 478 (6th Cir. 2018).

This is because the ALJ was (i) not even required to consider medical evidence predating the alleged onset date, *see Dyson v. Comm'r of Soc. Sec.*, 786 F. App'x 586, 588 (6th Cir. 2019); and (ii) neither Robinson's testimony about the current state of her carpal tunnel syndrome, nor the ALJ's reference to the pre-onset EMG results negated the requirement for the submission of medical evidence from within the relevant period, *see* SSR 16-3p, 2016 SSR LEXIS 4 *15-19; *Carr v. Comm'r of Soc. Sec.*, No. 21-11307, 2022 U.S. Dist. LEXIS 145488, at *7-8 (E.D. Mich.

July 21, 2022) (finding that the claimant's testimony as to his current condition had to be considered in the context of the objective medical and other evidence); *Lumpkin v. Comm'r of Soc. Sec.*, No. 1:21-CV-481, 2022 U.S. Dist. LEXIS 38048, at *30-31 (N.D. Ohio Mar. 3, 2022) (rejecting the claimant's argument that the ALJ's reference to a record from before the relevant time period undercut his finding that she did not have a mental impairment). Accordingly, even if the ALJ could be faulted for citing minimal pre-onset medical records – and the court finds no fault in that here – Robinson has provided no basis to controvert the ALJ's conclusion about her manipulative limitations. Robinson has cited no evidence that the ALJ was required, but failed, to consider that would have altered her RFC on this functional issue. *See e.g.*, *Davis v. Comm'r of Soc. Sec.*, No. 13-13319, 2015 U.S. Dist. LEXIS 18613, at *8-9 (E.D. Mich. Feb. 17, 2015) ("Given this lack of evidence that Plaintiff's cognitive impairment meets an essential element of the Listing, there is no prospect that a remand to the Defendant Commissioner could produce a different outcome, and it follows that any error in the ALJ's step three inquiry was harmless.").

In contrast, the ALJ's analysis of Robinson's pseudotumor condition fell short of the applicable legal standards, because the ALJ never addressed the medical records related to that condition in his discussion of her RFC. *See Fleischer*, 774 F. Supp.2d at 877. Apart from acknowledging Robinson's complaints and Dr. Torrey's opinion, the ALJ's decision never mentioned Robinson's pseudotumor condition or her intercranial idiopathic hypertension. (*See* Tr. 17-24). In light of Robinson's testimony that she could not work – as the ALJ summarized – "primarily due to the effects of a pseudotumor" (Tr. 20), the failure to even mention the condition in his analysis of the medical evidence was error.

The ALJ rejected Robinson's subjective complaints – including her complaints about her pseudotumor – based on the "largely unremarkable" physical examinations and tests and "largely

13

conservative" treatment history. (*See* Tr. 22). But the ALJ's specific record citations to support these findings did not correlate to Robinson's pseudotumor condition; rather, they related to a fibromyalgia examination, an endocrinologist examination, and a psychiatric examination. (Tr. 22). Although these other examinations may have indicated that Robinson exhibited normal examination results on specific dates (other than fibromyalgia pain), or that she had been noncompliant with her thyroid medication, they did not establish that Robinson's pseudotumor-related complaints were inconsistent with her multiple trips to the hospital, blurred vision, and the pressure evidenced from her lumbar punctures. (Tr. 22-23). And these were the very things the ALJ cited to find Dr. Torrey's opinion to be unpersuasive. Notably, Dr. Torrey was the main source of Robinson's medical evidence related to her pseudotumor. Simply stated, there was a disconnect between what the ALJ cited for discounting Robinson's complaints and the records that actually related to the condition she most complains about.

An ALJ's failure to adequately explain the rejection of a claimant's subjective symptom complaints may be harmless. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) ("[H]armless error analysis applies to credibility determinations in the social security context."). Before the court can find the error harmless, however, we must find that the ALJ explained his rejection of Robinson's subjective pseudotumor complaints elsewhere in the decision. This he did not do. *See Bovenzi v. Comm'r of Soc. Sec.*, No. 1:20-CV-00185, 2021 U.S. Dist. LEXIS 64165, at *34-36 (N.D. Ohio Jan. 28, 2021) (finding that the ALJ's error in failing to discuss the intensity, persistence, and limiting effects of the claimant's symptoms was harmless because the ALJ adequately discussed the symptoms elsewhere in the opinion). Here, the court cannot conclude "that the ALJ considered all of the relevant evidence and that a reasonable mind might accept that evidence as adequate to support the ALJ's subjective symptom complaint finding."

14

*Craddock v. Comm'r of Soc. Sec.*, No. 1:21-CV-00821, 2022 U.S. Dist. LEXIS 138246, at *53 (N.D. Ohio Aug. 3, 2022) (internal quotation marks and alterations omitted). The ALJ failed to show his work by failing to identify the records to support his conclusion that Robinson's subjective pseudotumor complaints were actually inconsistent with the record evidence. Absent the ALJ's explanation, the court – and more importantly Ms. Robinson – is left to guess as to why the ALJ rejected Robinson's subjective complaints. The ALJ failed to build the logical bridge between the evidence and his conclusion sufficient to permit meaningful review. *See Fleischer*, 774 F. Supp.2d at 877. Accordingly, the error was not harmless, and the court must remand. *Rabbers*, 582 F.3d at 654.

## IV. Recommendation

Because the ALJ failed to apply proper legal standards in explaining the reasoning behind his rejection of Robinson's subjective symptom complaints, the Commissioner's final decision denying Robinson's applications for DIB and SSI is vacated and Robinson's case is remanded for further consideration.

**IT IS SO ORDERED.**

Dated: March 24, 2023

Thomas M. Parker
United States Magistrate Judge

15